W. G. POND, EX'R, *v.* HENRIETTA SKEEN *et al.*, and
SARAH M. GLEAVES *et al. v.* HENRIETTA SKEEN *et al.*

1. HUSBAND AND WIFE. *Separate estate. A parol gift* of a chattel to create a separate estate, must be clearly expressed at the time so as to cut off the marital rights of the husband.

2. SAME. *Same.* Where the intention of the donor is not clearly expressed at the time, the silence or acquiescence of the husband will not invest the wife with a separate estate.

3. SAME. *Same.* A settlement made by the husband to the separate use of the wife, will be held to be in consideration of the money or property received from the wife; and if of equal value, will be held to satisfy the wife's equity growing out of money or property received by her from her father.

---

FROM SUMNER.

---

Appeal from the Chancery Court at Gallatin. H. H. LURTON, Ch.

J. J. TURNER for complainants.

MUNDY & BATE for defendants.

McFARLAND, J., delivered the opinion of the court.

Jeremiah Sarver died about the 13th of September, 1867, in Sumner county, leaving a will, by which, among other things, he bequeathed all his notes, evidences of debt and moneys to his wife Henrietta, his executor W. G. Pond, and three grand children named, to be equally divided between them. After the qualification of the executor, he demanded of the widow—who had custody of the testator's effects—the notes, etc.,

and moneys on hand, and received from her some three or four thousand dollars in notes and other evidences of debt, but no money.  Some twelve or fourteen months after the death of said Sarver, the widow married W. P. Skeen, and on the 25th of August, 1869, the executor filed the first of these bills, in which he charges that the grand children mentioned, insist that the widow retained a large amount of means, consisting of gold, silver and greenbacks, amounting to $1,500 or $2,000, which she should account for before receiving anything under the aforesaid clause of the will.

The executor says he has no knowledge of the facts, but for his own safety, deems it proper to file the bill and call upon the parties to litigate and settle the question.   Thereupon the grand children and the husbands of two of them who are married women, file their bill, in which they reiterate the charges as to the suppression and concealment of the money and other assets by the widow, in more positive form, and fix the amount at several thousand dollars.   Skeen and wife answer the bill, denying the material allegations as to the suppression and concealment of the money or other assets, and insist that everything was turned over to the executor which rightfully belonged to the estate.   They say that the story probably originated in the fact that on the 16th of February, 1869, they were robbed of some $600 or $700 in gold, some $40 in silver, about $500 in greenbacks, some four or five hundred dollars in notes of the Bank of Tennessee, known as the Torbett issue;  that $380 of the money thus lost belonged to defendant W. P. Skeen, the bal-

ance was the separate funds and property of the defendant Henrietta; that she at various times received means from her father, William Lynch, and her mother in her lifetime, consisting of a negro woman, which she sold, and also money at several times, and she also received a tract of land which adjoins the home place; that her husband, said Jeremiah Sarver, never claimed or exercised any ownership over said property, but on the contrary disclaimed all such rights, and permitted her to hold the same as her separate estate, to loan and collect the money in her own name.

Upon the question as to whether there were funds on hand at the death of the testator and the amount of the same, there is great conflict in the testimony. There is upon the one side testimony going to show that he received considerable sums of money within a year or so before his death. On the other hand, we have his statement to a number of witnesses shortly before his death, that he had no money.

William M. Gleaves, the husband of one of the legatees, testifies to conversations with the testator, in which the latter told him of having a large sum of money concealed at a certain place near the head of the stairway in his house, and Gleaves says he saw the money at that place on the day the testator died, and estimates the amount at $7,000 or $8,000, though he did not count it. Mrs. Gleaves and Mrs. Anthony (also a legatee), say they saw the money, but their testimony is somewhat conflicting in its details. We should probably be inclined to take this testimony with many grains of allowance, especially as to the amount

of money actually concealed. The strongest testimony against the defendants, however, is their repeated statements in reference to the robbery. Shortly after their marriage, they left their house and went on a visit to Wilson county, and were gone several days. On their return, they gave out the report, that the house had been robbed in their absence, of a large sum of gold, silver, greenbacks and Tennessee bank notes; the sum, as generally stated by them, was $4,000. They stated that it had been taken from a place of concealment at the head of the stairs, which they pointed out to some of the witnesses, and which corresponds with the place referred to by Gleaves and others. This, especially in view of the statements in their answer as to the robbery, is sufficient to establish that there was money to some amount on hand.

If they really had no money, or only the amount stated in their answer, no reasonable motive can be conceived for fabricating the story as to the robbery, or at least to so large an amount.

Whether the story of the robbery be a fabrication or not, it must be taken as strong evidence against these defendants, of the fact that they had in their hands money left by the testator at his death. If fabricated, it must have been for the purpose of avoiding liability to the executor or other legatees. If the robbery really occurred, it would be no defense, as it appears that the widow had, for more than a year, refused to disclose and turn over the money to the executor,—this would render her liable, and her subsequent loss of the money would not relieve her from

liability. There is no testimony corroborating their statement as to the robbery, and the circumstances throw doubt and suspicion upon the story.

In a conversation soon after the supposed robbery, the defendant told the executor Pond, that the amount lost was $800 or $1,000 in gold and silver, and $1,500 in paper money, $500 of which he claimed. To Barker he said, the loss was about $4,000—$2,000 in gold, $500 in silver, $1,000 in greenbacks, and $500 in Tennessee money, and claimed that $100 belonged to him. To Butler he said, the amount lost was $3,500, in gold, silver, greenbacks and Southern money. Mrs. Skeen said to Braden, that the loss was $4,000, in gold, silver, greenback, Tennessee and Confederate money. To Angela they said, the loss was $4,000— $1,500 in hard money, $1,500 in greenbacks, and $1,000 in uncurrent money on different banks and some Confederate money. In view of the conflict in these statements, and the general tendency to exaggerate in matters of this character, it would, perhaps, not be proper to hold the defendants bound by these statements as admissions of a larger sum than $3,500, especially as there is some doubt as to whether uncurrent funds did not in part go to make up the estimate.

The next question is as to the claim of Mrs. Skeen to this money as her separate estate. She claims that the origin of the funds was property and money given to her by her father and mother. In her answer she says one slave, and money from time to time; in her deposition she says two slaves. Although it was conceded in *Eaves* v. *Gillespie*, 1 Swan, 128, that a gift

of a chattel by parol to a married woman, might be to her sole and separate use, yet it was said that it must be so clearly expressed at the time, otherwise the marital right of the husband would attach. " This right, provided in wisdom and policy and exercising a most happy influence upon the social relations, is a fixed and stable right of the common law, and unless the intention to displace it be perfectly manifest, it should be allowed to have its full effect."

It is not insisted in the present case that the gifts to Mrs. Sarver from her father and mother were accompanied by any intention expressed at the time to exclude the right of the husband. They were simply gifts to her without more, and it is clear the money and chattels became in law the money and property of the husband upon coming to his possession, as any other property owned by him.

It is insisted, however, that Mrs. Sarver was permitted by her husband to use and control the fund entirely as her own, and that he disclaimed any right or interest in it; and there is the testimony of a number of witnesses to the effect, that upon being applied to in several instances to borrow money, the testator said he had no money, but his wife had some, and would loan it; and in some instances the notes were made payable to her, but in other cases made payable to him. They say also, that the testator said it was her money, and it came from her father. The amount of money to which he seemed thus to concede her right, cannot be definitely ascertained; however, it is clear that it did not extend to so large a sum

as defendants claim ' to have lost, probably not more than a few hundred dollars.

Whether a husband may thus invest his wife with a separate estate, we need not in the present case definitely determine. However, in *Wade* v. *Cantrell,* 1 Head, 346, it appeared that there had been a parol gift of a slave to the wife, with possession for three years; it was held that title was vested in the husband, although he said all the time she belonged to the wife and set up no claim to her himself. Judge Caruthers said, that a man cannot denude himself of the title to property which the law casts upon him, by simply declaring that it belongs to his wife. However, we need not pursue this question further in the present case. It appears that the testator purchased a tract of land at the price of $1,800, and took the title to his wife, and this was intended as a settlement upon her in consideration of her money and property received from her father, and was paid for, in part at least, with funds thus received; and we do not think he intended to concede to her a separate estate to the amount of $3,500 or $4,000 besides this. And in fact, we think the tract of land referred to, fully satisfies her equities growing out of funds and property received from her father and mother. The proof does not satisfy us that the amounts received by her exceeded the amount paid for the land. Sarver was a man of wealth, and the money was doubtless his own; but if her right was conceded to any additional estate, it was not so separated from his estate as to be capable of being traced. We think,

however, upon the whole evidence, his statements on the subject are susceptible of other explanations—and even conceding for the argument, that a separate estate for the wife might be thus created, we think the testimony not sufficiently definite in this case.

The decree of the Chancellor, therefore, must be affirmed, reducing the amount, however, from $4,000 to $3,500,—with the further modification, also, that Mrs. Skeen's share under the will be · deducted, as there appears to be no debts.

The costs of this court will be divided.